IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 04-11-KAJ |
| ) | |
| IVAN SMITH, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

### I. Introduction

In this criminal case, the defendant, Ivan Smith, was convicted after a two day jury trial of possession with intent to distribute five grams or more of cocaine base, of carrying a firearm during and in relation to a drug trafficking crime, and of being a felon in possession of a firearm. (Docket Item ["D.I."] 1, D.I. 69, D.I. 72.) Immediately before jury selection began, defense counsel stated that his client wished to move to dismiss the indictment because of "certain inaccuracies or down and out falsehoods with respect to what was put before the Grand Jury ... ." (Tr. at A-12.)[1] I briefly heard the defendant's grounds for the motion to dismiss, but I reserved decision and directed the defendant to provide his motion and related arguments in writing. (*Id.* at A-13, A-18.) The defendant filed a *pro se* motion to dismiss on August 16, 2006 (D.I. 64), another motion to dismiss through counsel on August 24, 2006 (D.I. 79; the "Motion"), and yet

---

[1]Citations to "Tr. at __" are to the trial transcript in this case; citations to "G.J. Tr. at __" are to the transcript of testimony before the grand jury testimony.

another one *pro se* on August 28, 2006 (D.I. 80).² The government has had an opportunity to respond (D.I. 81), and the defendant has had an opportunity to reply (D.I. 82). For the following reasons, the Motion is denied.

## II. Background

### A. Events Leading to Indictment

At both the suppression hearing (*see* D.I. 20) and at trial, law enforcement officers testified to seeing the defendant at close range (Tr. at A-85), in an area of the

---

²The defendant's filing of three separate versions of his motion, not to mention an unauthorized *pro se* reply (D.I. 85), rather than filing the single motion he was permitted to file through counsel, is symptomatic of the challenges his behavior has presented throughout this case. As the record reflects, the defendant has difficulty conforming his behavior to any authority beyond himself. Despite my admonition that he allow his counsel to speak for him, the defendant has repeatedly stepped in and, to no beneficial effect, argued on his own behalf. Examples of such behavior include his insistence that his attorney from the Federal Public Defender's office could not properly represent him. The colloquy which occurred in open court on that occasion speaks for itself. So too does the colloquy that followed his attempt to terminate the representation of the next lawyer appointed to represent him. Most recently, the defendant has written a letter (D.I. 87) again attacking, among other targets, that same lawyer, a gentleman with years of experience as a criminal defense attorney and a well-deserved reputation for excellence in that role. The defendant claims that the U.S. Attorney's Office, other federal law enforcement officials, his court-appointed attorney, and I are all involved in a racist conspiracy to deprive him of his Constitutional rights. (*Id.* at 4.) It appears sadly certain that, no matter what is said or done in this case, short of granting an acquittal, the defendant will believe it is a result of a plot by "oppressors," rather than recognizing it as the consequences of his own illegal activities. In any event, I will not address the defendant's unauthorized *pro se* filings, except to deny any relief based upon them. "[A] *pro se* defendant 'does not have a constitutional right to choreograph special appearances by counsel.' Nor does the Sixth Amendment require a trial court to allow hybrid representation in which defendant and attorney essentially serve as co-counsel." *United States v. Schwyhart*, 123 F. App'x 62, 68 (3d Cir., Feb. 16, 2005) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)). The defendant has highly competent counsel who has filed argument on the Motion, and, with that argument on record, the court and opposing counsel cannot be expected to sort through the defendant's multiple and at-times conflicting filings to figure out whether something different is really being argued.

City of Wilmington known for drug dealing (*id.* at A-75-76, A-82), engaging in a hand-to-hand transaction with another individual, during which the defendant accepted United States currency and then placed a small object in the other person's hand. (*Id.* at A-82-85; A-154.) Based on their training and years of experience, the police officers believed that they had just witnessed an illegal drug transaction. (*See id.* at A-85-86.) Wearing clothing emblazoned with the word "POLICE" on the front and back (*id.* at A-78-79), four officers emerged from the car they were in and announced to the defendant that they were police officers. (*Id.* at A-87-88; A-155.)

The defendant immediately fled. (*Id.* at A-88; A-155.) He ran into a nearby house, shutting the door behind him. (*Id.*) One of the officers pursued him into the house and saw, upon opening the front door, that the defendant was fleeing through the back door. (*Id.* at A-92-93.) The chase continued, with the defendant finally being apprehended by another officer, but only after the defendant had emerged from an alley and thrown a glove into a nearby garbage can. (*Id.* at A-161-62.) When one of the officers retrieved the glove from the garbage can, he discovered that it contained a gun. (*Id.* at A-170-71.) Cocaine was found discarded along the route that the police believe the defendant had taken in his flight. (*Id.* at A-176-79.)

### B. Evidence Presented for Indictment

The present Motion is based on allegations that, in obtaining an indictment in this case, the government presented to the grand jury the testimony of an agent of the United States Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") who was unfamiliar with the case, and that the indictment was therefore founded upon materially

false and improper evidence. (*See* Tr. at A-12-15; D.I. 79 at 1-2.) More specifically, the defendant asserts that ATF Special Agent Patrick Fyock gave false testimony on the following points.

First, according to the defendant, "Agent Fyock testified that the defendant was one of the two males the police initially observed in the hand-to-hand transaction which prompted the formulation of the plan [to] enlist the assistance of ... [other officers] to arrest these individuals." (D.I. 79 at 2; citing G.J. Tr. of 2/12/04 at 4.) Agent Fyock "reiterated that ... false testimony when he confirmed that the defendant was the person who engaged in the initial hand-to-hand transaction and then fled into the house." (D.I. 79 at 2; citing G.J. Tr. of 2/12/04 at 11.) The defendant rightly points out that the police officers involved in the events at issue testified that the defendant was not one of the individuals involved in an earlier drug transaction that they had witnessed and which prompted them to go through the neighborhood again with additional officers. (*See* Tr. at A-106-07, A-189-91.)

Second, again according to the defendant, "Agent Fyock testified that a 'small glassine baggy' measuring approximately three inches by an inch and a half to two inches of drugs was found within 'three to six feet' of the defendant." (D.I. 79 at 2; citing G.J. Tr. of 2/12/04 at 5, 12, 15.) The defendant asserts that the police officer who found the drugs testified that the drugs were approximately 35 feet from where he was arrested. (*See* D.I. 79 at 2.)

Third, the defendant says that "Agent Fyock falsely testified that the residents of the house did not know defendant, that he did not have permission to enter their

residence, and that he forced his way into the residence." (D.I. 79 at 2; citing G.J. Tr. of 2/12/05 at 5, 17.) According to the defendant, he was authorized to enter the residence, and he did not enter it by force. (*See* D.I. 79 at 2-3.)

Finally, while not a question of false testimony, the defendant complains that the prosecutor engaged in misconduct when he failed to stop a colloquy between a grand juror and Agent Fyock in which the agent made reference to the defendant's invoking his right to remain silent. (*See id.* at 3-4.)

### III. Legal Standard

"A district court is bound by the doctrine of 'harmless error' and may not dismiss an indictment on the basis of prosecutorial misconduct before the grand jury without making a factual finding that the defendant was prejudiced by that misconduct." *United States v. Huggins*, Cr. No. 03-091-SLR, 2004 WL 2434301 at *1 (D. Del. Oct. 21, 2004). In *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), the United States Supreme Court explained the showing necessary to establish prejudice: "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (internal quotation marks and citation omitted).[3] In applying that standard, the United States Court of the Appeals for the Third Circuit has noted that, "[t]he only instances in which the Supreme Court has recognized this exception to the harmless error rule have

---

[3]The Court noted that this was the standard "at least where dismissal is sought for nonconstitutional error ... ." *Bank of Nova Scotia*, 487 U.S. at 256.

involved grand juries selected in a discriminatory manner, which tainted the fact finding process itself." *United States v. Soberon*, 929 F.2d 935, 940 (3d Cir. 1991).

## IV. Discussion

In the present case, the testimony before the grand jury surely could have been given more effectively by one of the officers actually involved in the investigation and arrest. Agent Fyock's testimony was, at certain points, less than clear on certain facts. However, there is no basis whatsoever to conclude that any mistakes were the result of deliberate deception or misconduct by the agent or the U.S. Attorney's office. Agent Fyock's testimony was clear on the central facts which led to the indictment and which, when described at trial by the police officers who chased down the defendant and arrested him, led to the defendant's conviction.

The first and the third issues raised by the defendant are, on their face, tangential. Whether the defendant was involved in an earlier drug transaction that evening is simply irrelevant. Whether the defendant had permission to enter the house is also irrelevant for purposes of a probable cause finding, as opposed to a suppression ruling.[4] What matters, and what was testified to by Agent Fyock, is that the police witnessed the defendant, in a high crime area (D.I. 81 at Ex. A., pg. 17), engage in a

---

[4] I have previously concluded that the preponderance of the evidence is that the defendant did not have permission to enter the residence, that he fled through it simply because it was the closest convenient route to escape the police. (D.I. 20 at 3.) Since the evidence to which the defendant points to say that Agent Fyock's testimony was false is actually information that came out some two years after the grand jury testimony, the argument that Agent Fyock should have known better is unpersuasive. Moreover, whether the defendant's entrance involved force or simply opening a door goes to the issue of whether he had lawful access to the home, which, again, is a suppression issue, not a point with meaningful bearing on whether there was probable cause to indict.

hand-to-hand transaction that they believed to be a drug deal. (*Id.* at 4.) The police announced themselves as police, and the defendant fled. (*Id.*) The police pursued the defendant as he ran through a house and attempted to elude them. (*Id.* at 5.) An officer witnessed the defendant discard what was later found to be a gun. (*Id.*) The police later found "in the general vicinity" a baggy with a "white, chunky substance" that turned out to be "crack" cocaine. (*Id.* at 5-6.) The defendant was found in possession of a digital scale, commonly used for weighing drugs, and with the residue of a white substance in his pocket, though the amount of the substance was too small to test. (*Id.* at 5, 16.)

The only "false testimony" point made by the defendant that has any meaningful bearing on the probable cause finding is the defendant's perception of a discrepancy between Agent Fyock's statement that the drugs were found "in the general vicinity" (*id.* at 5), which he later defined as "in proximity – three to six feet" (*id.* at 12), and the statement at trial that the drugs were found in an 35 foot alley (Tr. at A-177).[5] The problem here is two-fold. First the ambiguity in the grand jury testimony, and second the ambiguity in the trial testimony.

As the government notes, the grand jury testimony is ambiguous because it is unclear what question Agent Fyock was answering. The passage of testimony is as follows:

---

[5]The defendant also attempts to make an issue of Agent Fyock's description of the bag in which the drugs were found. The size-of-bag issue is without significance to the question of probable cause, particularly since the agent told the grand jury the amount of the drugs that were recovered. (*See* D.I. 81 at Ex. A, pg 6.) The question of whether the bag was "glassine" or "plastic," assuming there is a difference, is also of no moment. (*See* D.I. 79 at 2.) The undisputed evidence is that the bag had crack in it.

> A Grand Juror: How close was the bag you found?
> Agent Fyock: It was in proximity – three to six feet.

(D.I. 81 at Ex. A, pg 12.) It is simply unclear whether the grand juror was asking how far the bag with the drugs was from the spot where the defendant was arrested, or whether the question was how far the bag was from the defendant's observed route of attempted escape. Under the former reading, which is the defendant's, the testimony can be seen as at odds with the testimony of Detective Leary, one of the police officers who testified at the trial. Under the latter reading, it is not.

The second ambiguity is in Detective Leary's trial testimony. Here is the relevant passage:

> Q: And again, detective, about how far from the site, from the place where the defendant was arrested was it to the place where you found the crack cocaine?
> A: Again, this alleyway is approximately 35 feet long.

(Tr. at A-177.) The answer given is non-responsive. One can assume, given the context, that the detective's statement about the length of the alley was meant to also answer the question about how far the drugs were from where the defendant was ultimately apprehended, but it is an assumption.

In any event, these two ambiguous pieces of testimony do not combine to create a basis for saying that the defendant was prejudiced by Agent Fyock's grand jury testimony. Even assuming the defendant's reading of the testimony, the evidence at trial, which put the defendant 35 feet away from the drugs, was sufficient, in combination with the other evidence, to convict the defendant of guilt beyond a reasonable doubt. It is therefore highly unlikely that the grand jury would not have

indicted at the much lower threshold of probable cause, had Agent Fyock answered the "how close was the bag" question by saying "35 feet."

Finally, the assertion of prosecutorial misconduct regarding the invocation of Fifth Amendment rights also fails. The colloquy at issue was exceedingly brief:

> A Grand Juror: When he was questioned, did he ever admit to anything?
> Agent Fyock: He would not make any statements at all. When he was Mirandized, he invoked Miranda and would make no statements.
> A Grand Juror: So he never said like why he ran through the house?
> Agent Fyock: He never said any statement. ..."

(D.I. 81 at Ex. A, pgs 16-17.) A grand juror asked a direct question, and the agent responded, albeit with more information than might have been ideal. Nevertheless, the direct and truthful response cannot be seen as undermining the grand jury's inquiry or otherwise requiring dismissal of the indictment. *See United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1245-46 (10th Cir. 1996) (reference before grand jury to defendant's invocation of Fifth and Sixth amendment rights "was a response to a question posed by a grand juror and not an impermissible attempt to infringe on the ability of the grand jury to exercise its own independent judgment in determining whether there was probable cause"); *United States v. Levine*, 700 F.2d 1176, 1181 (8th Cir. 1983) ("there was no impropriety in telling the grand jury of ... appellant's refusal to talk to the law enforcement officers ... .").

In summary, the defendant has, at most, pointed to technical and minor errors in the evidence presented to the grand jury and has made no showing that the fundamental fairness of the grand jury proceeding was affected. *See Lopez-Guitierrez*, 83 F.3d at 1245 (only when claimed errors go "'beyond the question of whether the grand jury had sufficient evidence upon which to return an indictment' and essentially

threaten[] the defendant's rights to fundamental fairness," is indictment open to question notwithstanding a subsequent guilty verdict by the petit jury (internal citation omitted)). Because the defendant has failed to establish that the alleged errors "substantially influenced the grand jury's decision to indict," or that there is "grave doubt that the decision to indict was free from the substantial influence" of the alleged problems in Agent Fyock's testimony, *Bank of Nova Scotia,* 487 U.S. at 256 (internal quotation marks and citation omitted), the motion to dismiss must be denied.

**Conclusion**

Accordingly, it is hereby ORDERED that the defendant's motion to dismiss the indictment (D.I. 79) is DENIED; it is further ORDERED that any relief based upon the defendant's unauthorized *pro se* filings (D.I. 64; D.I. 80) is also DENIED.

_____
UNITED STATES DISTRICT JUDGE

November 13, 2006
Wilmington, Delaware